**2026 UT App 125**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DONALD CASSIDY,
Appellant.

Opinion
No. 20240585-CA
Filed August 6, 2026

Fourth District Court, Provo Department
The Honorable Robert C. Lunnen
No. 191402087

Douglas J. Thompson, Attorney for Appellant

Derek E. Brown and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

MORTENSEN, Judge:

¶1     Donald Cassidy was convicted of raping and forcibly
sodomizing his fiancée's underage daughter, Stephanie.[1] Cassidy
appeals, arguing that the inculpatory statements he made during
a police interview were taken in violation of his *Miranda* rights
because he unambiguously and unequivocally invoked his right
to counsel. He also asserts that the district court erroneously
barred his expert from testifying at trial about what the words and
syntax he used may have meant when he apparently confessed to
the charged crimes in a phone call with Stephanie and during his
interview. Finally, he avers that the district court made a number

---

1. A pseudonym.

of other erroneous evidentiary rulings. We reject all of Cassidy's arguments and affirm his convictions.

BACKGROUND[2]

*The Assault*

¶2      In September 2018, Cassidy was living in Provo, Utah, with his children, his fiancée (Mother), and Mother's sixteen-year-old daughter, Stephanie. On September 8, Stephanie and her friend (Friend) took LSD at Friend's house. That afternoon, the two went to Cassidy's house, where they drank beer with another minor. Later in the evening—while Mother was working and not at home—Cassidy offered Stephanie methamphetamine, and the two went to Cassidy's room and smoked some of it together. After that, Stephanie smoked some more methamphetamine, this time with Friend, and then spent more time with Friend and others before telling them that she was going to bed. She prepared for bed by putting "a tampon in" because she "was at the end of [her] period" and "didn't know for sure if [she] was off of it." She then went to Cassidy's bedroom, where Cassidy was already in bed, and lay on his bed and watched television.

¶3      While Stephanie was trying to fall asleep, Cassidy began fondling her breasts and her groin. Stephanie then pretended to be asleep, and Cassidy pulled aside her underwear and inserted his penis into her vagina. Although Cassidy temporarily stopped the assault, he then performed oral sex on her. He then reinserted his penis into Stephanie's vagina. At some point, Stephanie "gained enough courage to pretend [she] was moving to get

---

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (cleaned up).

comfortable" in order to make it seem like she was having a "disturbing dream." In response to these movements, Cassidy "got off" of Stephanie "slowly." Cassidy then fell asleep in the bed as Stephanie tried, but struggled, to fall asleep herself.

¶4     The next morning, Stephanie went to the bathroom to "dig out" the tampon, which had been pushed painfully deep inside of her during the assault. She then sent Friend messages on Snapchat asking him to come over to Cassidy's house and "bring anything that could get [her] drunk or high." From the tenor of the messages, Friend could tell that Stephanie was "distress[ed]." When Friend arrived at Cassidy's house, Stephanie told him what Cassidy had done to her the prior night. The assault, however, was not reported to law enforcement at that time.

*The Allegations and the Pretext Call*

¶5     The next year, Stephanie was living in foster care when she reported the incident to her foster mother, who in turn reported the allegation to the police. A detective (Detective) investigating the allegations facilitated and recorded a pretext phone call between Stephanie and Cassidy.

¶6     Stephanie began the call by asking Cassidy whether he remembered when they "smoked meth" together. While Cassidy initially denied remembering the incident, he then said, "Okay, what's your point?" Stephanie answered, "Do you remember when I was trying to sleep and you said we'd never talk about it again and you had sex with my body?" Cassidy initially responded, "Okay, say that again? And you know, we shouldn't be talking about this." After Cassidy said that Child Protective Services (CPS) was "watching" him and that he had an upcoming drug test, Stephanie stated that she didn't care about what "CPS says or anything" and that she just needed to tell Cassidy that she "felt attacked that day when [he] did those things to [her]." After a lengthy pause, Cassidy responded, "I knew you were going to do this to me." Then, in response to Stephanie's request that

Cassidy "just tell [her] that [he] did it," Cassidy stated, "No, because I didn't, and I'm not going to admit to something . . . I didn't do." However, in response to Stephanie's later statement that "it wasn't consensual," Cassidy said, "I know. But you know what? My whole life is ruined." Stephanie then began asking him whether he had just admitted that he knew the sex hadn't been consensual when Cassidy interrupted her and said, "No." Later in the call, Stephanie again asked Cassidy why he couldn't confess so she could "get over it." Cassidy responded, "Because it's going to ruin me, [Mother], all the kids, you, everything, okay?" Finally, in response to Cassidy's accusation that she was trying to "screw up" his life, Stephanie stated, "Well, if I tell you that, would you tell me that you fucking raped me?" Cassidy responded, "I didn't."

*The Interrogation*

¶7 Following the pretext call, Detective and another officer arrested Cassidy at his workplace and took him to the police station for interrogation. At the outset of the interrogation, Detective told Cassidy that he had "some questions" for him. Detective said that before they could proceed, he had to read Cassidy his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Cassidy twice indicated that he understood his rights. Detective then presented Cassidy with a form setting forth his *Miranda* rights and asked Cassidy to sign it if he was willing to waive those rights and speak with him and answer some questions. While Cassidy was reading the form, Cassidy stated, "I'll answer what questions I can because I don't know why I'm here. And I will—I do want a lawyer." Immediately after he said that he wanted a lawyer, however, Cassidy signed the waiver form, which specifically stated, "I am willing to make a statement and answer questions. I do not want a lawyer at this time." Noticing the contradiction between Cassidy's words and the waiver form that he had just signed, Detective explained, "You just said you want a lawyer. If that's what your answer is, then I actually won't be

able to . . . ask you my questions without you having a lawyer." Cassidy responded, "You can ask me your questions, and if I feel like my rights are being not, whatever, then I will stop you and ask for a lawyer." Detective then clarified, "So, currently, you're willing to speak with me without your lawyer, but if you change your mind, you'll let me know? . . . Is that what you're saying?" Cassidy answered "yes" to both questions.

¶8     At the beginning of the interrogation, Cassidy denied that anything sexual happened between him and Stephanie. He speculated that if anything had happened, it was that Stephanie had touched him inappropriately while he was asleep. Detective then lied to Cassidy, telling him that the police had found Cassidy's DNA on the underwear Stephanie wore on the night of the incident. Confronting this falsity, Cassidy stated, "I remember one time she was laying in my bed, and she was rubbing . . . her butt up against me. And I'd fallen asleep. And I don't know if maybe it made me hard, and she could have put it in her or I don't know. But I don't remember anything." He stated further, "Whatever happened was not against her will because she was doing it. . . . She was just rubbing up against me, and I had fallen asleep, you know? And . . . like I said, I don't know if I'd gotten a hard-on or not because I passed out."

¶9     Cassidy was then taken to the county jail and was charged with two counts of rape, one count of forcible sodomy, and one count of distribution of or arranging to distribute a controlled substance.

*The Pretrial Proceedings*

¶10    Before trial, Cassidy moved to suppress the interrogation, arguing that Detective violated his Fifth Amendment rights because his waiver was not knowingly, voluntarily, and intelligently made. The district court denied the motion, concluding, based on the totality of the circumstances, that Cassidy understood and knew his rights before he waived them.

The court found particularly important that Cassidy took "some time" to "read through" the waiver form, stated multiple times that "he knew his rights," and indicated that he would stop the questioning if he did not "want to answer another question."

¶11 Cassidy also sought to introduce evidence under rules 608 and 609 of the Utah Rules of Evidence to undermine Stephanie's credibility. Cassidy claimed such evidence included—among other things—Stephanie's (1) text messages in which she recanted the allegations underlying the charges in this case, (2) history of practicing witchcraft to "hex" her biological father, (3) hearing voices telling her to kill others, (4) admittedly false accusations that her brothers had sexually abused her, and (5) prior juvenile adjudication for assault with a deadly weapon. The district court excluded the juvenile assault adjudication under rule 403 of the Utah Rules of Evidence. Specifically, the court found that the adjudication's probative value was "super low" because it was not for sexual assault and that its potential for unfair prejudice was "very high." The court determined, however, that evidence of Stephanie recanting could "definitely come in . . . on cross." Still, the court limited much of the other evidence, seemingly under rule 403. However, the court also effectively reserved judgment on some of the evidence, noting that some decisions about admissibility were "going to have to wait until trial."

¶12 For its part, the State moved to exclude testimony from Cassidy's linguistics expert regarding whether Cassidy's statements during the pretext call and interrogation actually constituted admissions of guilt. The court determined that the expert's testimony would go to Stephanie's credibility, which the court thought was "a huge problem." The court also found it problematic for an expert to "say how the jury should interpret terms" because the jurors were "to decide on their own . . . the meaning of the terms that were used based on all the surrounding circumstances in this case." For these reasons, the court barred the expert from testifying.

*The Trial*

¶13    At trial, the State called Stephanie and Detective, among other witnesses, and they testified to the facts recited above. The State introduced the recordings of the pretext call and police interrogation through Stephanie's and Detective's testimony.

¶14    Stephanie also testified that Mother had tried to "manipulate" her to get the State to drop the charges. As part of these efforts, Stephanie claimed, Mother pressured her to submit a letter to the State in which she recanted the allegations. According to Stephanie, Mother had actually written the letter. The State also presented text messages that Stephanie had sent to Mother, one of which stated, "It didn't fucking happen. Screenshot that. [Cassidy] did not rape me. I was on acid and was delusional. I was with [others] all night long." In response to the State's question about why she had written that message, Stephanie said, "I was fed up with her . . . mind games. So I gave in and I snapped, in a way."

¶15    After Stephanie testified, Detective took the stand. During cross-examination, Cassidy's counsel asked Detective where in the police interview Cassidy had "admit[ted] to something." Detective responded that there were "several points in the interview" where Cassidy had admitted to something. In response to counsel's follow-up question asking him where in the call Cassidy had "admit[ted] to the rapes," Detective stated,

> So the . . . first point where he admits to rape was where he actually blames the victim and says there was . . . one time in my bed where she started rubbing her butt up against me, and I don't know if I got hard or something, and that she may have slipped it in. He admits to that.

To this, Cassidy's counsel asked, "Isn't that a lot more speculation than admission? . . . This might have happened?" Detective responded, "No, that's an admission."

¶16 After the State rested, the defense called a number of witnesses. Some of those witnesses had been in Cassidy's home for the entire night of the incident. They testified that Stephanie had either been in her room the entire night or had not entered Cassidy's room. Mother—who had been working and was not at Cassidy's home that night—also testified, stating that Cassidy has erectile dysfunction, which prevents him from "get[ting] an erection." When the State, on cross-examination, attempted to confront Mother with text messages suggesting that she tried to dissuade Stephanie from cooperating with the investigators in this case, Mother became nonresponsive and the State ended its questioning. For his part, Cassidy elected not to testify.

¶17 The jury convicted Cassidy on all counts.

ISSUES AND STANDARDS OF REVIEW

¶18 Cassidy appeals, raising three issues. First, he argues that he unambiguously and unequivocally invoked his right to counsel under *Miranda* and that the district court should therefore have granted his motion to suppress the custodial interview. "We review a district court's ruling on a motion to suppress for correctness, and we review its factual findings in support of its ruling for clear error." *State v. Qayum*, 2025 UT App 178, ¶ 29, 582 P.3d 1245 (cleaned up), *cert. denied*, 585 P.3d 47 (Utah 2026).

¶19 Second, Cassidy maintains that the district court abused its discretion when it barred his linguistics expert from testifying at trial. "The trial court has wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard. Under this

standard, we will not reverse a decision to admit or exclude expert testimony unless the decision exceeds the limits of reasonability." *See, e.g., State v. Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794 (cleaned up). We nonetheless review the challenged ruling "to ensure that no mistakes of law" affected how the court exercised its discretion. *Eskelson ex rel. Eskelson v. Davis Hosp. & Med. Center*, 2010 UT 59, ¶ 5, 242 P.3d 762 (cleaned up).

¶20    Finally, Cassidy asserts that the court abused its discretion by excluding Stephanie's prior assault adjudication and various other evidence that may have been relevant to her credibility. We review a court's evidentiary rulings for an abuse of discretion. *See, e.g., State v. Alonzo*, 973 P.2d 975, 980 (Utah 1998) (rule 403); *State v. MacDonald*, 2017 UT App 124, ¶ 18, 402 P.3d 91 (rule 404(b)); *State v. Alzaga*, 2015 UT App 133, ¶ 31, 352 P.3d 107 (rule 609).

ANALYSIS

I. The Motion to Suppress

¶21    Cassidy argues first that the district court erred in denying his motion to suppress, asserting that he invoked his right to counsel and the interrogation should therefore have stopped under *Miranda*. Because the record demonstrates that Cassidy did not unambiguously and unequivocally invoke that right, we are not persuaded.[3]

---

3. The State argues that Cassidy did not preserve his argument because, in the proceedings below, he failed to "alert the district court to any concerns that all questioning should have ceased based on his oral statement of invocation." Because we can easily resolve this issue on the merits in favor of the party arguing that it wasn't preserved, we elect to exercise our discretion to do so "without addressing preservation." *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415.

¶22 "Where an individual is subject to custodial interrogation and not given *Miranda* warnings, any statement made by that individual is inadmissible at trial." *State v. Jessop*, 2023 UT App 140, ¶ 38, 540 P.3d 713 (cleaned up). But a suspect may waive *Miranda* rights if he or she does so "voluntarily, knowingly and intelligently." *State v. Qayum*, 2025 UT App 178, ¶ 69, 582 P.3d 1245 (cleaned up), *cert. denied*, 585 P.3d 47 (Utah 2026). Even after waiving *Miranda* and answering the interviewer's questions, however, a suspect may invoke the right to counsel at any time, and—assuming the invocation is unequivocal and unambiguous—the interviewer must stop the interrogation. *See, e.g.*, *Davis v. United States*, 512 U.S. 452, 458 (1994) ("If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him. But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." (cleaned up)). With limited exceptions not at issue here, the State "may not use any statements made by the accused taken in violation of *Miranda*'s protections." *Qayum*, 2025 UT App 178, ¶ 69 (cleaned up).

¶23 Cassidy contends that before he signed the waiver form, he unequivocally and unambiguously indicated that he was willing to answer Detective's questions but that he also wanted a lawyer present. Invoking *Edwards v. Arizona*, 451 U.S. 477 (1981), Cassidy argues that Detective rejected his "legitimate request" to counsel and that he was entitled to have counsel present during the interrogation. In *Edwards*, the United States Supreme Court explained that "when an accused has *invoked his right* to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* at 484 (emphasis added). And once the suspect has "expressed his desire to deal with the police only through counsel," he cannot be subjected "to further

interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.*

¶24 *Edwards* does not offer Cassidy the sanctuary he seeks. Invoking the right to counsel under *Miranda* requires a suspect to "unambiguously request counsel in such a way that the desire to have counsel present is sufficiently clear." *Qayum*, 2025 UT App 178, ¶ 64 (cleaned up). If the "suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, the questioning may continue." *Id.* ¶ 65 (cleaned up). That said, "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Davis*, 512 U.S. at 461.

¶25 Under the facts here, Cassidy's request for counsel was ambiguous and equivocal. In a vacuum, his statement that he did "want a lawyer" would certainly constitute an unambiguous and unequivocal request. But the statement wasn't made in a vacuum. Instead, Cassidy uttered the words while he was reading the waiver form, which specifically stated, "I do not want a lawyer at this time." Specifically, right before he signed the form, he stated, "I'll answer what questions I can because I don't know why I'm here. And I will—I do want a lawyer."

¶26 Detective recognized the contradiction between Cassidy's words and the waiver form. For this reason, Detective then sought to clarify whether Cassidy in fact wanted a lawyer, a clarification that is acceptable—and often affirmatively encouraged—under the law. *See id.* Specifically, Detective explained, "You just said you want a lawyer. If that's what your answer is, then I actually won't be able to . . . ask you my questions without you having a lawyer." And Cassidy responded, "You can ask me your

questions, and if I feel like my rights are being not, whatever, then I will stop you and ask for a lawyer." Detective then clarified, "So, currently, you're willing to speak with me without your lawyer, but if you change your mind, you'll let me know? . . . Is that what you're saying?" Cassidy responded "yes" to both questions.

¶27 Pointing to this exchange, Cassidy asserts that "Detective tried to talk [him] out of his request for a lawyer by falsely claiming that [he] could not both ask and answer questions and have the aid of counsel." At oral argument, Cassidy's appellate counsel contended,

> [The government] needs to follow *Miranda* as it's written. It's written very precisely for this purpose so that they . . . aren't putting defendants in the bind of having to choose between their rights. They're presented with all of their rights, not in this . . . one against the other perspective. You have the right to remain silent. You have the right to have an attorney here with you while you talk to us. [*Miranda*] does not say you have the right to an attorney, but if you ask for one, we won't talk to you. . . . It makes Mr. Cassidy decide, do I want to talk or do I want to have a lawyer here? And he has to weigh those against each other after he's already invoked.

In short, appellate counsel argues that in response to Cassidy's clear invocation of the right to both answer questions and have an attorney present, Detective presented Cassidy with a false dichotomy—i.e., answer questions or have an attorney present— and that his doing so violated Cassidy's constitutional rights. However, the trouble with Cassidy's argument is that (1) Cassidy did not clearly state that he wanted to talk but only with an attorney present and (2) Detective did not respond to Cassidy's statement with a false dichotomy.

¶28    First, immediately after he indicated his willingness to answer the questions he could while stating that he wanted a lawyer, Cassidy signed a written waiver (which he appeared to have been reading prior to signing) that said, "I am willing to make a statement and answer questions. I do not want a lawyer at this time." Cassidy's oral statement and his contemporaneous written waiver were plainly at odds. His oral statement conveyed that he would answer questions but only with an attorney present. By contrast, his written waiver conveyed that he was presently willing to speak with Detective without an attorney. This ambiguity justified Detective's subsequent attempt to ascertain Cassidy's intent.

¶29    Second, Detective sought to ascertain that intent by stating, "You just said you want a lawyer. If that's what your answer is, then I actually won't be able to . . . ask you my questions without you having a lawyer." Contrary to appellate counsel's assertion, this statement did not present the false dichotomy that Cassidy's only options were to answer questions or to have an attorney. Rather, it plainly implied a scenario where Detective would be able to ask Cassidy questions with a lawyer present.

¶30    Under these circumstances, a reasonable officer in Detective's shoes "would have understood only that [Cassidy] *might* be invoking the right to counsel," so Detective was free to continue the interrogation without counsel present. *See Qayum*, 2025 UT App 178, ¶ 64 (cleaned up). Cassidy pushes back, arguing that he "possessed the form for a total of 24 seconds," which, "excluding the Provo Police logo and the witness signature lines, contain[ed] 181 words." This would have required him to read approximately 7.5 words per second to read through the entire form, which he correctly states is "fast."[4] More broadly, Cassidy

_____

4. At oral argument, the point was made that after Cassidy indicated he wanted counsel, he placed his left hand over part of

(continued…)

again overlooks the context in which the alleged invocation was made. As the district court noted in the waiver context, Cassidy specifically stated at least twice that he understood his rights. And his remarks before he signed the form—when considered in tandem with his statement after he signed that he would stop the questioning if he felt like his rights were "being not, whatever"—strongly suggest he knew that he had a right to counsel. Consequently, his contention that he didn't understand this right when he signed the waiver form seems empty. And given Cassidy's repeated statements that he understood his rights and his signing a waiver of those rights in front of Detective after he was given an opportunity to read the waiver reasonably led Detective to perceive an ambiguity between Cassidy's oral invocation of the right to counsel and his contemporaneous written waiver of that right.

¶31    In summary, the circumstances under which Cassidy told Detective that he wanted a lawyer make clear that he did not invoke his right to counsel in an unambiguous and unequivocal way because (1) when he made the request, he signed a form specifically waiving his right to counsel and (2) he confirmed that he was willing to speak with Detective without a lawyer present. For these reasons, the district court properly denied the motion to suppress and admitted the custodial interrogation.

## II. The Motion to Exclude Expert Testimony

¶32    Cassidy argues next that the district court erroneously granted the State's motion to exclude his linguistics expert from testifying about the pretext call and the police interview. He

---

the waiver form and, in so doing, may have obscured the language regarding the waiver of a right to counsel. We have reviewed the interrogation footage and the document, and it appears unlikely that Cassidy's hand had actually obscured the relevant language.

maintains that the expert would have used "conversation analysis" to aid the jury in its determination of "how Cassidy understood the pretext call, how he understood Stephanie's specific questions and statements, [Cassidy's] frames of reference, and which interpretations are best supported by Cassidy's responses in the custodial interrogation." And he argues the error was harmful because the jury heard testimony from Detective that some of Cassidy's statements during the police interview constituted admissions. In response, the State argues first that "[t]here is no way for Cassidy to establish error or prejudice on appeal because he failed to put [the] expert's reports into the appellate record." On the merits, the State contends that the linguistics expert's testimony "would not have helped the jury evaluate the plain-English pretext call and interview" and that Cassidy has not shown harmful error "because the jury could make its own assessment of his recorded statements and the extent to which they corroborated Stephanie's testimony." We first assess the State's inadequate record argument and conclude that the record on appeal is plainly adequate to reach the merits. On the merits, however, we are not persuaded that the district court abused its discretion in excluding the expert's testimony.

A.    The Adequacy of the Record

¶33    The State spends the bulk of its brief on this issue arguing that Cassidy has not presented us with an adequate record on appeal that would enable us to review whether the court erroneously barred the linguistics expert from testifying at trial. Specifically, the State contends that Cassidy should have included the expert's reports in the record and that his failure to do so should keep us from reaching the merits. We disagree.

¶34    Under our rules of appellate procedure, "[t]he record on appeal consists of the documents and exhibits filed in or considered by the trial court, including the presentence report in criminal matters, and the transcript of proceedings, if any." Utah

R. App. P. 11(a). "The burden is upon the appellant to provide an adequate record for review, and without an adequate record, we must assume the regularity of the proceedings below." *Gorostieta v. Parkinson*, 2000 UT 99, ¶ 34, 17 P.3d 1110. Cassidy has met that burden here.

¶35 Because Cassidy seeks review of the district court's ruling on the motion to exclude, we must consider what the court had before it when it ruled on the motion. *See* Utah R. App. P. 11(a) (requiring that the record include "the documents and exhibits *filed in or considered by the trial court*" (emphasis added)). The record suggests that neither the State's motion to exclude nor Cassidy's opposition included the expert's reports as exhibits. And the State does not argue that the reports were before the court. Most importantly, the court did not purport to base its ruling on the reports. The court instead appears to have relied on a proffer or descriptions of the anticipated testimony in the written briefing and oral argument. And the briefing and the transcripts from the oral argument do appear in the record. Consequently, the record is sufficient for us to address the merits of Cassidy's argument. *See, e.g.*, *State v. Bridgewaters*, 2025 UT App 184, ¶ 26 n.5, 585 P.3d 73 (rejecting the State's assertion on appeal that the defendant failed to produce an adequate record when the record included the relevant transcripts), *cert. granted*, 591 P.3d 746 (Utah 2026). For these reasons, we disagree with the State's inadequate record argument.

### B. The Merits

¶36 On the merits, Cassidy argues that the "need for a linguistics expert became clear when the district court determined that [he] waived *Miranda*" rights and that "the custodial interrogation would be admitted at trial." He contends that the court abused its discretion in excluding his expert's testimony because the court incorrectly determined that the testimony (1) would have gone to the credibility of witnesses and thereby

impermissibly invaded the jury's province and (2) would not have been helpful to the jury because the jurors could "decide on their own . . . the meaning of the terms that were used on all the surrounding circumstances in this case."

¶37 Rule 702 of the Utah Rules of Evidence allows "a witness who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will *help the trier of fact to understand the evidence or to determine a fact in issue*." Utah R. Evid. 702(a) (emphasis added). "Thus, under rule 702, the question that must be posed prior to the admission of any expert evidence is whether, on balance, the evidence will be helpful to the finder of fact." *State v. Campos*, 2013 UT App 213, ¶ 75, 309 P.3d 1160 (cleaned up). Although district courts have considerable discretion on this front, if we determine that the court erroneously interpreted rule 702 or committed another mistake of law when it granted the motion to exclude the expert's testimony, then it "did not act within the limits of reasonability, and we will not defer to" the ruling. *See Eskelson ex rel. Eskelson v. Davis Hosp. & Med. Center*, 2010 UT 59, ¶ 5, 242 P.3d 762. For the reasons that follow, we conclude that the court did not abuse its discretion when it determined that the expert's testimony would not be helpful. Consequently, we can dispose of the issue on the court's second basis for excluding the expert's testimony and need not address the first. *See, e.g.*, *Brady v. Park*, 2019 UT 16, ¶ 7, 445 P.3d 395 (declining to address one argument when the court's resolution of another was dispositive of the underlying issue).

¶38 Cassidy argues that the court should have admitted his linguistics expert's testimony under *State v. Rasabout*, 2015 UT 72, 356 P.3d 1258. He claims that the case stands for the broad proposition that "lawyers and judges . . . professionally hyperfocus on vocabulary and sentence structure" and are nonetheless "incapable of expertly defining words and phrases

. . . and need expert guidance." From this, he maintains, it necessarily follows that "a jury would benefit from a primer on linguistic analysis during a multiple rape trial." But as the State correctly suggests, the only language from *Rasabout* that could plausibly be relevant to Cassidy's argument centered on a dispute over whether "corpus linguistics" was an appropriate tool to interpret ambiguous *statutes*. *See id.* ¶¶ 16–21. Nowhere in its opinion did the Utah Supreme Court discuss the propriety of using an expert to interpret for the jury what a witness may have meant when he or she said something. Consequently, *Rasabout* simply does not help Cassidy here.

¶39 Moreover, "when assessing the helpfulness of evidence under rule 702, the [district] court must first decide whether the subject is within the knowledge or experience of the average individual." *State v. Draper*, 2024 UT App 152, ¶ 66, 560 P.3d 122 (cleaned up). Juries are tasked with discerning the facts from the evidence, including witness testimony, based on common sense and "in the light of their experience as to the natural inclinations of human beings." *M.K. v. Doyle*, 2014 UT App 160, ¶ 7, 330 P.3d 1278 (cleaned up); *see also, e.g.*, Model Utah Jury Instructions 2d CR401, https://legacy.utcourts.gov/muji/?cat=2 [https://perma.cc/GN2Z-ZDTM] (instructing the jury to use "common sense in evaluating all witnesses"). Cassidy points us to no authority beyond *Rasabout* and another case discussing corpus linguistics in the context of statutory interpretation, *see Salt Lake City Corp. v. Haik*, 2020 UT 29, ¶ 23 n.29, 466 P.3d 178, to support his contention that juries need expert witnesses to understand plain English and the nuances of how people communicate with each other. And for reasons we've already explained, those cases do not help Cassidy's argument.

¶40 Finally, Cassidy also maintains that his expert should have been allowed to testify to effectively rebut Detective's statement at trial that Cassidy admitted to the conduct on the pretext phone call with Stephanie. While this argument has some superficial

appeal, it doesn't stand up to meaningful scrutiny. The court resolved the motion to exclude prior to trial, so Detective had not testified yet. Where Cassidy did not object to Detective's statement at the time he made it, there is no reason for us to review the court's ruling as of that time. District courts rule on motions based on the evidence, arguments, and information they have before them. But they are well within their authority to revisit those rulings when the facts on the ground change. *See, e.g.*, *IHC Health Services, Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 27, 196 P.3d 588 (explaining that a district court's prior decisions bind the parties for subsequent stages of the case but that the court itself is free to reconsider those decisions prior to appeal). Here, Cassidy does not argue that the district court had an obligation to revisit, sua sponte, its ruling on the motion to exclude and allow his expert to testify in response to Detective's statement. Nor does he argue that his counsel was ineffective in failing to object to the statement. And there is a good explanation for why his counsel would not have objected, namely that the statement was made in direct response to his counsel's own question about where in the phone call Cassidy had admitted to anything. In short, where the court ruled on the motion to exclude prior to Detective's challenged statement and where Cassidy's counsel elicited that statement, we find no merit in this argument.

¶41   For these reasons, the district court did not exceed the limits of reasonability in ruling that the linguistic expert's testimony would not have been helpful to the jury. Consequently, the court did not abuse its discretion in granting the motion to exclude the testimony.

### III. Excluded Evidence Bearing on Stephanie's Credibility

¶42   Finally, Cassidy argues that the district court abused its discretion when it declined to admit evidence of Stephanie's assault adjudication and other acts and that he suffered prejudice as a result. The State counters, asserting that Cassidy has failed to

adequately brief the adjudication argument and that he did not preserve his other-acts argument. We conclude that the district court did not abuse its broad discretion when it excluded the assault adjudication under rule 403 of the Utah Rules of Evidence. We further determine that Cassidy has not preserved his argument that the court should have admitted the other-acts evidence under rule 404(b). We explain each conclusion in turn.

A.      Stephanie's Assault Adjudication

¶43    The district court did not analyze the admissibility of Stephanie's adjudication for assault under rule 609, as Cassidy argues on appeal it should have. *See* Utah R. Evid. 609(d) ("Evidence of a juvenile adjudication is admissible under this rule only if: (1) it is offered in a criminal case; (2) the adjudication was of a witness other than the defendant; (3) an adult's conviction for that offense would be admissible to attack the adult's credibility; and (4) admitting the evidence is necessary to fairly determine guilt or innocence."). Rather, it appears that the court simply reasoned that, even if the adjudication was admissible under rule 609, it still had to pass a rule 403 balancing to be admissible. *See id.* R. 609(a)(1)(A) (subjecting evidence that attacks a witness's character to rule 403). This is where the district court focused its analysis when it concluded that the probative value of the assault adjudication was substantially outweighed by the danger of unfair prejudice. *See id.* R. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

¶44    In order to prevail on appeal, Cassidy must engage with the district court's rule 403 reasoning. In other words, Cassidy bears the burden of persuading this court "through reasoned, supported argument that the district court committed harmful, reversible error—a burden that necessarily requires

[him] to address the reasoning and basis of the . . . court's ruling and to explain why [the] court got it wrong." *See Cottam v. IHC Health Services Inc.*, 2024 UT App 19, ¶ 15, 544 P.3d 1051 (cleaned up). When "an appellant does not meaningfully engage with the [district] court's reasoning, that appellant falls short of demonstrating any error" on the court's part. *State v. Millett*, 2025 UT App 67, ¶ 34, 572 P.3d 389 (cleaned up), *cert. denied*, 585 P.3d 44 (Utah 2026). And this is where Cassidy comes up short.

¶45 Cassidy makes what can best be described as a minimal effort to engage with the court's rule 403 reasoning. While the reasoning of the district court may not have been well articulated, Cassidy still needs to engage with the balancing test underlying it. While Cassidy certainly points to some of the factors from rule 403, he does not make a meaningful effort to show how Stephanie's violent behavior associated with her assault adjudication bore on her credibility, the consideration of which was critical to the court's rule 403 determination.

¶46 Cassidy argues on appeal,

> When Stephanie committed assault, and threatened harm to others, she faced serious consequences. Those consequences were imposed by the State. Stephanie's conviction taught her that the State has a monopoly on force and can hurt people. Immediately following her interaction with the State, she learned how to weaponize the government against Mother, and she chose the easiest target. Her soon-to-be stepdad.

This argument, while creative, is so steeped in speculation that it does next to nothing to address the probative value of the assault adjudication. Cassidy's reasoning appears to be that Stephanie's legal troubles taught her that she could weaponize the power of the State to punish her enemies. And Cassidy makes the leap that

Stephanie's adjudication taught her she could lie to achieve this end. We are not buying this line of thought. Taken to its logical conclusion, anyone stung by the American justice system must be assumed to have learned to lie as a means to seek revenge. This is far too attenuated to get anywhere near showing the assault adjudication has probative value for truthfulness—and certainly not to a degree that it would outweigh the danger of unfair prejudice. In other words, while Cassidy admirably attempts to glean probative value from the adjudication, his argument suffers from too many improbable inferential leaps for it to cast meaningful doubt on the district court's exercise of its ample discretion here.

¶47     The court balanced its determination that the adjudication had low probative value against the evidence's potential for unfair prejudice, the latter of which it found was "very high." To be sure, the court could have explained in more detail why it believed that admitting the evidence created such a danger of unfair prejudice. But even with this shortcoming in mind, we see little issue with the court's determination on this point. The assault adjudication could have painted Stephanie in a bad light to the jury—as a person who is violent—thereby distracting the jury from the pertinent issues in the case. This strikes us as an example of both confusing the issues and unfair prejudice, the latter of which refers to "an undue tendency to suggest decision on an improper basis." *State v. Logue*, 2018 UT App 156, ¶ 23, 436 P.3d 136 (cleaned up). Consequently, although the district court didn't explain its finding on this point in much detail, the finding did not exceed the limits of reasonability.

¶48     Because Cassidy's efforts to meaningfully engage with the district court's rule 403 reasoning are lacking, we have no basis to conclude that the court abused its discretion in excluding Stephanie's juvenile adjudication for assault with a deadly weapon.

B.     Other-Acts Evidence

¶49     Finally, Cassidy argues that the district court abused its discretion when it excluded most of the other-acts evidence that he sought to introduce to undermine Stephanie's credibility. The State argues that Cassidy failed to preserve the issue. For reasons we explain below, we agree with the State on its procedural argument.

¶50     A party preserves an issue for appeal by presenting it "to the district court in such a way that the court has an opportunity to rule on it." *Orem City v. Jakeman*, 2025 UT App 187, ¶ 8, 583 P.3d 1090 (cleaned up), *cert. denied*, 588 P.3d 308 (Utah 2026). When a party does not "raise and argue" an issue before the district court, then the party "has failed to preserve [it]." *Id.* (cleaned up). In such a circumstance, appellate courts will not reach the issue on the merits "absent a valid exception to preservation." *Id.* (cleaned up).

¶51     Cassidy maintains that the district court should have admitted various instance of other-acts evidence under rule 404(b) of the Utah Rules of Evidence to establish Stephanie's motive, opportunity, knowledge, intent, or lack of accident so Cassidy could more effectively undermine her credibility at trial. *See* Utah R. Evid. 404(b) (stating that other-acts evidence may be admissible for a non-character purposes such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"). The asserted evidence was extensive and included a claim that Stephanie placed a hex on her father using witchcraft and her prior false accusations that her brothers had sexually abused her. As the State correctly notes, however, Cassidy did not move for admission of the evidence under rule 404(b) and instead moved under rule 608(a). *See id.* R. 608(a) ("A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character."). In his opening brief, Cassidy

does not point to anything in the record to demonstrate that he raised the issue under rule 404(b) or that the court considered the rule when it decided the issue. And he does not even attempt to respond to the State's rule 404(b) preservation argument beyond his cursory statement that "[t]he evidentiary arguments were preserved." Under these circumstances, we agree with the State that Cassidy failed to present the issue "to the district court in such a way that the court ha[d] an opportunity to rule on it." *See Jakeman*, 2025 UT App 187, ¶ 8 (cleaned up). We therefore decline to address Cassidy's rule 404(b) argument on the merits.

CONCLUSION

¶52    Cassidy's invocation of counsel was neither unambiguous nor unequivocal, so his police interview was properly admitted at trial. He likewise has not established that the district court abused its discretion when it excluded his linguistics expert from testifying about the meaning of what he said during the pretext call and during the interrogation. Finally, Cassidy has not demonstrated that the court abused its discretion in excluding Stephanie's assault adjudication or various instances of other-acts evidence.

¶53    Affirmed.

––––––––––